(11 App. Div. 114.)

PEOPLE ex rel. INEBRIATES' HOME FOR KINGS COUNTY v. COMPTROLLER OF CITY OF BROOKLYN.

(Supreme Court, Appellate Division, Second Department. December 22, 1896.)

CONSTITUTIONAL LAW—REGULATION OF CHARITIES.

Laws 1877, c. 169, which provides that the comptroller of the city of Brooklyn shall pay for the Inebriates' Home for Kings County certain moneys, to be applied to the care of such persons as the executive committee of the home may judge require relief, is abrogated by Const. 1895, art. 8, § 14, which provides that no payment shall be made by any municipality to any charitable institution wholly or partly under private control, for any inmate who is not received and retained therein pursuant to rules established by the state board of charities, as payment under the act would defeat the purpose of the constitution to establish a uniform charity system.

Appeal from special term, Kings county.

Proceeding by the Inebriates' Home of Kings County against the comptroller of the city of Brooklyn for a mandamus requiring

him to pay over certain money to the treasurer of the relator. From an order denying the mandamus, relator appeals. Affirmed.

Argued before BROWN, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Josiah T. Marean, for appellant.

Joseph A. Burr, for respondent.

HATCH, J. The relator was created a corporation by chapter 843, Laws 1867, and is of the class denominated "charitable, correctional, and reformatory." It has been from its creation in part supported by moneys received by the board of excise for liquor licenses. The legislature has from time to time amended the act of incorporation. In 1877 (Laws 1877, c. 169) it was enacted that the comptroller of the city of Brooklyn should pay to the treasurer of said home 15 per cent. of all moneys received by him after the 1st day of April, 1877, from the excise commissioners of the city of Brooklyn, for licenses granted by them under the excise laws of the state; the money to be paid to the treasurer of the home upon the presentation of a certified copy of a resolution passed by the executive committee of said home, declaring that it is necessary for the care and maintenance of the indigent poor treated therein; the moneys to be paid by said comptroller within 30 days after the receipt thereof by him, as the same shall be called for by resolution of the executive committee of said home. The act required that the moneys thus received should be applied to the care and treatment in said home of such persons, actual residents of the county of Kings, as in the judgment of said executive committee may be poor and in such indigent circumstances as to require relief and support. Under this act, money, as required, was paid by the comptroller to the treasurer of the home, to the full amount of 15 per cent. of the amount received, up to the 1st day of January, 1895, since which time, although resolutions of the executive committee of the home have been passed and presented to the comptroller for such moneys, he has refused to pay over the same. Among the grounds upon which the comptroller bases his refusal to pay is that the law, so far as it commands the payment of these moneys to this institution, is repugnant to the constitution of the state. The provisions of the constitution which are thus brought in question are found in article 8, §§ 11–15, inclusive. These sections, being in pari materia, are to be considered and construed together. Each is a new section, and the subject-matter has never before found place in the fundamental law of the state. Much that is found in section 11 has for its basis various statutory enactments whereby had been created a board of commissioners of charities with more or less well-defined powers, and which had been engaged in the performance of certain specified duties in connection with the various charitable organizations of the state. The necessity for the continuance of this board and the creation of others was apparent, as well as was the enactment in the fundamental law of a fixed and definite scheme of government of the various charitable and

reformatory institutions of the state. And this scheme, in all its essential features, was a new scheme devised for the purpose of meeting the wants which a large body of persons within these institutions, and of those which should thereafter be admitted, required; also, to limit the purpose for which public moneys should be expended in connection therewith, and yet preserve the institutions, secure the fruits of private enterprise and generosity which had been expended for the benefit of unfortunate people, and to correct abuses which the former system had engendered. Section 11 provides for a state board of charities, a state commission in lunacy, and a state commission of prisons, and upon each commission specific duties are imposed. Section 12 provides that the governor, by and with the consent of the senate, shall appoint the members of the said board and of the said commissions. Section 13 saves existing laws, so far as they are not inconsistent with the constitution, and provides that visitation and inspection provided for shall not be exclusive. Then follows section 14, which is the present, particular subject of construction, and which reads:

"Maintenance and Support of Inmates of Charitable Institutions. Section 14. Nothing in this constitution contained shall prevent the legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper; or prevent any county, city, town or village from providing for the care, support, maintenance and secular education, of inmates of orphan asylums, homes for dependent children or correctional institutions, whether under public or private control. Payment by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the legislature. No such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the state board of charities. Such rules shall be subject to the control of the legislature by general laws."

Section 15 continued in power the state board of charities and lunacy for the time for which they were appointed, unless the legislature should otherwise provide, and authorized the conferring of additional powers upon such boards by the legislature, not inconsistent with the provisions of the constitution. It seems to be apparent, from a mere reading of these sections of the constitution, that the provisions are not limited to prospective acts of the legislature, but embrace the whole subject-matter, present and future, and create and provide a new scheme of management and new procedure when public money is to be appropriated in support of any such institution. Where the board of commissioners of charities have practical control and charge of the institutions coming within its jurisdiction, it shall formulate rules for the admission into any institution of any person, and, unless such rules be complied with, no payment of any money shall be made. It would seem that this contemplated a change in management and payment, not alone as to prospective action, but as to existing condition. Certainly, if the act of 1877 as to the payment of moneys was to be continued in force, then the absolute right exists to have and receive such moneys without regard to any action of the board of charities, and

without regard to the consideration of whether they have complied
with its rules. The right to demand these moneys is wholly in-
dependent of the constitutional provisions, or else, if it be subject
thereto, it is to receive payments, not under the act, but such as
may be authorized by the legislature; for the constitution speaks
alone of payments that may be authorized, and its language is,
"No such payments shall be made," unless the rules are complied
with. If relator is entitled to these moneys, then the scheme of
the constitution is defeated, or may be; for, its right being de-
pendent upon the act of the legislature, it continues until the act
be repealed, and, if the act be never repealed, then the constitu-
tional provisions, as to it, are a nullity. We are of opinion that a
construction which works such a result is not permissible. Cer-
tainly, it is one that was not contemplated by the framers of these
provisions of the constitution. In the constitutional debates which
resulted in the adoption of these provisions it was said by Mr.
Choate, in speaking of section 14:

"We can venture to say in the constitution that no dollar of public money shall
be paid for any inmate of a private institution * * * except under such rules
and regulations as that board shall create. Now, what will happen? This con-
stitutional amendment being adopted, that board will lay down rules and regula-
tions, * * * and this abuse to which I refer, if this amendment is passed, can
be and will be rooted out." Constitutional Convention Record, vol. 5, p. 2396.

The debate by other members upon the same question was of like
tenor. Id. pp. 2393, 2408, 2416. Now, all this could not happen,
and the purpose of the framers of the constitution might be de-
feated, if it should now be the law that public moneys could be
drawn and expended in utter disregard of these provisions. The
constitution has now been in force nearly two years, and, if the
contention of the appellant is sound so far as these moneys and
this institution is concerned, it has not been affected in the slightest
degree by this constitutional provision. The fact, if it be one, that
the money received would only be applied to the relief of persons
actually residents of the county of Kings, or that the executive
committee would not act in defiance of rules established by the
state board of charities, or, if they did, that ample remedy is lodged
either in the state board or in the attorney general of the state to
correct such abuse, is mere idle claim. The sufficient answer to
the whole claim is that it would defeat and nullify the purpose and
object of the constitutional provision, and this has ever been held
sufficient for the rejection of such construction. People v. Draper,
15 N. Y. 532–544; People v. Albertson, 55 N. Y. 50; People v. Pot-
ter, 47 N. Y. 375. We think the clear intention of the constitution
was to wipe out all existing laws for the appropriation of public
moneys for the support and maintenance of these institutions in-
consistent with its provisions, and substitute, in the place and stead
thereof, the system formulated in the constitution. In this re-
spect its provisions are self-enforcing, and by virtue of its own
power it operates as a repeal and abrogation of all statutes in con-
flict with or repugnant to it. Cooley, Const. Lim. p. 99. The pass-
age by the legislature of an act authorizing the payment of public

moneys by the several political divisions of the state (chapter 754, Laws 1895), following immediately upon the adoption of the constitution, and in pursuance of its provisions, is a contemporaneous act placing practical construction upon such provisions, and as such is entitled to weight in the construction of the provisions themselves. In re New York Dist. Ry. Co., 42 Hun, 621–627; Cooley, Const. Lim. p. 81 et seq. Rules have been adopted by the state board of charities in pursuance of the constitution, and these acts, with the constitution, cover the whole question, and establish a uniform, harmonious system which it was the purpose of the constitution to accomplish. In People v. Board of Supr's, 12 Misc. Rep. 187, 33 N. Y. Supp. 602, Mr. Justice Bartlett, in a learned opinion delivered at special term, held that this constitutional provision (section 14) operated directly upon existing statutes, and that its effect was to modify the act by striking out the command to pay, leaving simply in force the authorization to pay. The latter subject is now wholly covered by the act of 1895 (chapter 754). We concur in the views expressed in that opinion, and adopt the reasons for the construction as our own.

It follows, from these views, that the order appealed from should be affirmed. All concur.